APPEAL OF PHILIP T. STARCK, EXECUTOR, ESTATE OF PHILIP A. STARCK.

Docket No. 4051.    Submitted December 12, 1925.    Decided January 30, 1926.

A transfer of stock, under circumstances disclosed by the evidence, three years and three months prior to the donor's death, *held*, not to have been made in contemplation of death.

*A. M. Frumberg, Esq.*, for the taxpayer.
*John F. Greaney, Esq.*, for the Commissioner.

Before LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in estate tax, amounting to $122,903.98, arising from the increase in the value of the gross estate by the inclusion therein of $1,260,096.93, representing the value of 1,357 shares of the capital stock of the P. A. Starck Piano Co., alleged to have been transferred by the decendent to his son and two daughters on January 8, 1919, in contemplation of death.

FINDINGS OF FACT.

Philip T. Stark is the regularly appointed, qualified, and acting executor of the estate of Philip A. Starck, who died March 21, 1922, a resident of Chicago, Ill.

Philip A. Starck and his son, Philip T. Starck, became engaged in the piano business in a small way in 1898. Sales of pianos increased rapidly and in 1906 the business was incorporated. Shortly thereafter the corporation began the manufacture of its own pianos. At the date of organization the capital stock consisted of 2,000 shares of the par value of $100 each, of which 1,990 shares were issued to the decedent and 10 shares to the son, Philip T. Starck, the former being made president and the latter treasurer of the company. The by-laws of the corporation gave to the treasurer equal powers with the president in the management of the business. The president and the treasurer worked in complete harmony, with the result that the business continued to grow and, many years prior to the decedent's death, a number of branch houses had been established in various cities.

Philip A. Starck was active, jovial, and of an optimistic temperament. He was fond of entertaining in his home and each year took several weeks' vacation in Florida, California, or Europe. With the exception of occasional attacks of indigestion and headache over a period of about 15 years prior to his death, the decedent had never suffered from illness. He was indiscreet, however, in the matter of his diet, persisted in eating rapidly, and refused to obey his physician's advice as to his diet. On March 4, 1918, although he was not seriously ill, he went to a hospital in Chicago, pursuant to his physician's advice, for treatment, where he remained until March 28, 1918. He regarded his ailment as inconsequential. The doctor who had been his physician for a period of about 25 years explained that the stay at the hospital was for the purpose of forcing the decedent to rest and to diet. With the exception of those whom he informed of his stay at the hospital, his personal and business acquaintances did not know that he had been there. Thereafter, as had been the case before, his general health was good and, with the exception of receiving treatment for occasional attacks of indigestion, he did not at any time consult his physician. Until the date of his death he was active in the conduct of the business. During 1918 he made a will, and in one of the provisions thereof devised to his son 52 per cent of the stock owned by him in the P. A. Starck Piano Co.

On January 8, 1919, the decedent, being the owner of 1,857 shares of stock of the P. A. Starck Piano Co., transferred 520 shares thereof to his son Philip T. Starck, 419 shares to his daughter Lillian Starck, and 418 shares to his daughter Gladys M. Starck. The value of the 1,357 shares at the time of the transfer was $1,260,096.93. The transfer was absolute and all income derived from the stock so transferred was received and has been reported by the donees in their individual income-tax returns.

The executor did not include in the estate-tax return the value of said shares of stock as a part of the gross estate of the decedent. The Commissioner determined that the transfer was made in contemplation of death and, accordingly, on March 7, 1924, assessed the deficiency of $122,903.98, whereupon the executor filed a claim for the abatement of this amount, which claim was denied in its entirety by the Commissioner on April 24, 1925.

Philip T. Starck, although a material factor in the upbuilding of the business, owned but a small percentage of the stock of the corporation, the 10 shares owned by him in 1906 having been increased by purchase from time to time to 130 shares of the 2,000 shares outstanding on January 8, 1919, the remainder being owned by Philip A. Starck. During the period from 1906 to 1919 the son had married, purchased a home, and was rearing a family of four children. During 1917 he became dissatisfied with his interest in the corporation since, with the increase and expansion of the business, he was assuming greater responsibility in the management of it, and demanded of his father that he be given additional shares of stock, threatening to sever his connection with the business unless this was done. Thereupon, Philip A. Starck promised to adjust the stockholdings but delayed doing so until January 8, 1919, at which time he transferred to Philip T. Starck 520 additional shares. At the same time he transferred 419 and 418 shares, respectively, to his two daughters and retained 500 shares. At the time of the transfers the decedent did not contemplate death within the reasonably near future. The primary purpose of the transfers was to reward his son for his services and a desire to have his daughters independent during his lifetime. He also had in mind in making the transfers a saving in the matter of Federal income taxes upon dividends received. At the time of the transfers the decedent contemplated retiring, but did not do so, and continued his activities in the conduct of the business substantially as he had before the transfers. In 1922, the decedent, with his two daughters, went to Los Angeles, Calif. While there he planned the establishment of a branch house in that city and the arrangements had proceeded to the point of the employment of a branch manager when, on March 31, 1922, the decedent suddenly died of heart disease at the age of 61.

### DECISION.

The deficiency determined by the Commissioner is disallowed.

### OPINION.

LITTLETON: The question presented in this appeal is whether the transfer of the stock by the decedent to his children on January 8,

1919, was made in contemplation of death, within the meaning of section 402 of the Revenue Act of 1918, which provides that the value of the gross estate shall be determined by including the value at the time of death of all property of the decedent to the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of death, except in the case of a *bona fide* sale for a fair consideration in money or money's worth.

The transfers here involved were made more than three years before the death of the decedent, and the presumption in the statute with respect to transfers made within two years prior to death does not arise.

In determining whether a transfer is made in contemplation of death, the Board must look to the expressions of the decedent, to the outward visible acts and circumstances surrounding a transfer of property prior to death. So far as the transfer of the 520 shares of stock to Philip T. Starck is concerned, it might well be said, under the evidence, that this transfer was for a fair consideration in money or money's worth, since it appears that the decedent's motive in making the transfer of stock to his son was in recognition of the valuable services rendered by him over a period of years and in compliance with the demand of the son that his interest in the business be increased.

There have been presented to this Board opposing pictures of practically the same state of facts. The executor portrays the decedent as physically strong, healthy, optimistic, and an energetic man both before and after his stay at the hospital in Chicago and the transfers of the stock in question; that for three years after the transfer of stock he continued his activities as he had for several years before, and that, although he had occasional attacks of indigestion and headache as a result of hearty eating, he regarded these ailments lightly and was not influenced by them in any way in making the transfers of the stock in question. The Commissioner, on the other hand, portrays the decedent as a man suffering for many years from severe headaches, serious stomach trouble, and heart disease, necessitating his going to a hospital for a period of 24 days and, in addition, spending a considerable portion of his time at health resorts; that his health was such in 1918 that he made his will and, in 1919, transferred the stock to his son and daughters in contemplation of death; and that, thereafter, he gradually declined in health until his death from heart disease on March 31, 1922.

R. A. Winterburn, secretary of the P. A. Starck Piano Co., testified concerning a conversation with the decedent, as follows:

In 1917 I was offered a position with another concern, and I went to Mr. Starck and told him my intention to leave and he asked me why; I told him I thought it was better for me; that I had a chance to get into this other concern and become a stockholder in the company and he told me at the time— he told me to stay—he said his holdings in the P. A. Starck Piano Company were too large, and that he was going to make some division of his stock; that Mr. P. T. Starck had been so helpful in building the business and had been so much help to him in looking after the branch stores and general business of the company, that he felt that it was no more than right he should have a larger interest in the business than he had at that time, and another thing, living expenses were getting higher and P. T's family was growing and it was his intention to make some division of his holdings at that time.  *  *  *

Q. Did Mr. P. A. Starck say anything to you about desiring to see his children enjoy this property during his lifetime?

A. Yes. He said that his son and daughters were entitled to enjoy a part of the money that he had made, and that he wanted to divide it up so that they could enjoy it, while he was living, and so that he could see them enjoy it, and that was also one of the reasons for dividing his stock.

Philip T. Starck testified that during 1917 he had several conversations with the decedent relative to a division of the stock and that finally, in the latter part of 1917, he stated to the decedent that unless he was given additional stock he would withdraw from the business, whereupon the decedent stated:

I want you to be satisfied with the business. You have been working hard. You have got a big family. He said, I am going to fix this thing up as soon as I possibly can now, so that everything will be all right.

This witness further testified that at the time of the transfers—

He [the decedent] told me he wanted me to have a substantial interest in the business. He said, " I will turn over a certain amount of stock to you, and I will turn over a certain amount to the girls, so that they will be independent, and each one can take care of their own. A great many men who have made a success in life wait until they die, then their children will get the money and have a good old time with it, and the man that made the money don't have the pleasure of seeing their children have a good time. I want my children to have a good time while I am alive. I want to see them enjoy this money. I want them to have this money just like it is their own, so that they can do with it what they want. I want them to have a nice house, with a nice automobile, and have parties and friends, and I am having the pleasure with them." That is just the conversation we had.

That the purpose of the decedent, and the cause which moved him to make these transfers, was to reward his son for faithful services and at the same time to provide for the independence of his two daughters during his lifetime, is established by the testimony of a number of the decedent's personal friends and business associates. It is shown that as far back as 1911 the decedent had dis-

cussed the matter of transferring certain of his stock to his son and daughters, and, also, the question as to whether it should be given to them direct or placed in trust.

As to the decedent's health, his physician for a period of more than 25 years prior to the transfers testified that he had never suffered from any serious illness and described him as a human dynamo.

Webster's Unabridged Dictionary defines " contemplation " as the act of looking forward to an event as about to happen; expectation; act of intending, purposing, or considering, hence, intention; consideration; etc.

An act may well be performed in contemplation of death at some time in the future and yet not be in contemplation of death within the meaning of that phrase as used in the statute. The intention of Congress in the enactment of section 402 of the Revenue Act of 1918 was to provide for the inclusion in the gross estate of the value of any property concerning which the decedent made a transfer, except for a fair consideration in money or money's worth, in contemplation of death within a reasonable time in the near future, as distinguished from the general expectation of death entertained by everyone.

In *Shwab* v. *Doyle*, 269 Fed. 321, the Circuit Court of Appeals said:

> On principle, and without present reference to authority, the ultimate question concerns the motive which actuated the grantor; that is to say, whether or not a specific anticipation or expectation of her own death, immediate or near at hand (as distinguished from the general and universal expectation of death some time), was the immediately moving cause of the transfer.

In *Meyer* v. *United States*, 60 Ct. Cls. 474, 483, the Court of Claims said:

> If it be said that there need not be a conviction that death is imminent, there must be at least a belief that it is to be expected in the very near future, rather than in the usual course of events, and in this state of mind, in this belief, in the near approach of death, must be found the motive for the conveyance if it is properly to be characterized as made in contemplation of death.

In *Spreckels* v. *State*, 30 Calif. App. 363, the court said:

> A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death that the property so transferred becomes amenable to the burden; or, as counsel for the respondents with singular aptness states the proposition: " It is only when contemplation of death is the motive without which the conveyance would not be made that a transfer may be subjected to the tax." That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer.

In *State* v. *Pabst*, 139 Wis. 561, the court said:

It is manifest that they [the words] were intended to cover transfers by parties who were prompted to make them by reason of the expectation of death, and which, in view of that event, accomplished transfers of the property of decedents in the nature of a testamentary disposition. It is therefore obvious that they are not used as referring to that expectation of death generally entertained by every person. The words are evidently intended to refer to an expectation of death which arises from such a bodily or mental condition as prompts persons to dispose of their property and bestow it on those whom they regard as entitled to their bounty.

In the case of *Rea* v. *Heiner*, 6 Fed. (2d) 389, the District Court for the Western District of Pennsylvania stated:

There is a common agreement that the words "contemplation of death," mean not the general knowledge of all men that they must die; that it must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand; and that, so arising, it must be the direct and animating cause, and the only cause, of the transfer. If this apprehension, so arising, is absent, there is not that contemplation of death intended by the statute, especially when another adequate motive actuating the gift is shown.

Applying these legal principles to the case in hand, I reach without difficulty the conclusion that the gifts in question made by Mrs. Oliver were not made in contemplation of death. Her sound condition, mentally and physically; her active participation in important affairs; her expressed belief that she would live to a very old age; the preparation she was making for extensive improvements on her farm and at her home in Canada—all these, in connection with the animating motives for the transfer hereinbefore found to exist, conclusively rebut and overcome the presumption of the statute.

See, also, *Conway's Estate*, 72 Ind. App. 303; *Rosenthal* v. *People*, 211 Ill. 306; *State Street Trust Co.* v. *Stevens*, 209 Mass. 373; *Commonwealth* v. *Fenley*, 189 Ky. 480; *In re Spaulding's Estate*, 63 N. Y. S. 694; *In re Palmer's Estate*, 102 N. Y. S. 236, 240; *Vaughan* v. *Riordan*, 280 Fed. 742.

In our opinion the evidence in this appeal does not justify the conclusion that the transfers of the stock were made in contemplation of death, within the meaning of the statute. On the contrary it appears from the evidence that the decedent was strong and active until the date of his death, and that he regarded his ailments inconsequential, and, with the exception of about three weeks' treatment in a hospital in 1918, he was never under the regular care of a physician. The decedent's motive in making the transfers appears to have been for the purpose of rewarding the son for his services, of providing for the independence of his daughters during his lifetime, and of reducing the Federal income tax, rather than in the expectation of death within the reasonably near future.